IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| JOSHUA BOYER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 1:24-cv-2014 (RDA/WEF) |
| | ) |
| STAND TOGETHER CHAMBER | ) |
| OF COMMERCE, INC., | ) |
| | ) |
| Defendant. | ) |

## **MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Defendant Stand Together Chamber of Commerce's Motion for Summary Judgment (Dkt. 15) (the "MSJ"). This Court has dispensed with oral argument as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter has been fully briefed and is now ripe for disposition. Considering the Motion together with the Memoranda in Support (Dkt. 16), Plaintiff's Opposition (Dkt. 18), and Defendant's Reply (Dkt. 19) as well as Defendant's Supplemental Brief (Dkt. 21),[1] this Court GRANTS the MSJ for the reasons that follow.[2]

## I. PROCEDURAL BACKGROUND

Plaintiff Jason Boyer filed his Complaint on November 12, 2024. Dkt. 1. On January 21, 2025, Defendant filed its Answer. Dkt. 7. That same day, a Scheduling Order issued. Dkt. 9. On February 19, 2025, Magistrate Judge William E. Fitzpatrick issued his Rule 16(b) Scheduling

---

[1] Both parties were provided an opportunity to submit supplemental briefing, but only Defendant did so. Dkts. 20, 21.

[2] Except with respect to citations to deposition testimony, all page number citations refer to the CM/ECF assigned page numbers.

1

Order, which specifically discussed the manner in which the parties should submit any summary judgment briefing.  Dkt. 11 at ¶ 9(f).

On June 6, 2025, Defendant filed its MSJ.  Dkt. 15.  On June 20, 2025, Plaintiff filed his Opposition.  Dkt. 18.  On June 26, 2026, Defendant filed its Reply.  Dkt. 19.

Unfortunately, due to an influx of emergency motions and habeas petitions the Court was not able to address the MSJ within the customary time period.  Accordingly, the Court permitted the parties to file supplemental briefing.  Dkt. 20.  On April 22, 2026, Defendant filed its Supplemental Brief.  Dkt. 21.  Despite an opportunity to submit additional briefing, Plaintiff failed to do so by the deadline.

## II.    UNDISPUTED STATEMENT OF FACTS

Summary judgment is appropriate only where there are no genuine disputes of material fact. *See* Fed. R. Civ. P. 56.  To this end, Defendants, in compliance with Rule 56 and Local Rule 56, set forth a statement of material facts in separate enumerated paragraphs that Defendants contends are undisputed and supported by record citations.  The Rules next required Plaintiff to respond to Defendants' statement of undisputed fact by "listing all material facts to which it is contended that there exists a genuine dispute" with citations to the record.  L.R. 56(B).  Plaintiff somewhat complied with this portion of the Rule.  Plaintiff did not fully comply with the Rules, however, because Plaintiff also set forth a "Statement of Additional Material Facts." Dkt. 18 at 12. Neither the Rules nor case authority permit this.  *See Sadeghi v. Inova Health Sys.*, 251 F. Supp. 3d 978, 981 (E.D. Va. 2017); *Immunogen, Inc. v. Iancu*, 523 F. Supp. 3d 773, 777–78 (E.D. Va. 2021) (refusing to consider a plaintiff's separate enumerated statement of facts opposing summary judgment), *vacated and remanded on other grounds sub nom. ImmunoGen, Inc. v. Hirshfeld*, 2022 WL 885774 (Fed. Cir. Mar. 25, 2022) (recognizing that it "is from [the movant's] statement of

2

undisputed facts and the nonmovant's response that a district court determines whether genuine issues of fact are disputed"). Nonetheless, the Court takes into account Plaintiff's asserted facts where appropriate and, even where not recounted below as undisputed facts, the Court considered all of the "Material Facts" proffered by Plaintiff in reaching a decision.

Accordingly, the following statement of facts is derived from a careful review of (i) Defendants' statement of undisputed facts; (ii) Plaintiff's Opposition to those facts; and (iii) the summary judgment record as a whole. Given this, the undisputed facts are as follows:

1. Defendant is a 501(c)(6) nonprofit entity.

2. As a nonprofit, Defendant receives much of its funding from donors, and relies on donor relationships. Defendant expects its employees to be "good stewards" of donor funds.

    a. Related to this use of donor funds, Defendant has an automated system notification that sends out emails and blocks the use of an employee's "PCard," which is used for travel and purchases, when transactions are greater than 45 days old and have not yet been submitted on an expense report.

    b. Plaintiff identifies two employees (Ingrid Cunningham and Katherine O'Neill) who received such emails and had their PCard use blocked.[3]

3. In late 2022, Plaintiff applied to Defendant for the position of Senior Administrative Assistant.

4. During the hiring process, Plaintiff was asked to submit to a background check. That background check flagged issues with Plaintiff's criminal history and Defendant asked for follow-up from Plaintiff to address those issues.

---

[3] Plaintiff admits-in-part and attempts to dispute-in-part the asserted fact. Plaintiff admits that Defendant relies on donations and donor relationships, but "disputes that Defendant expects employees to be 'good stewards' of donor funds to the extent such expectation implies consistent enforcement of financial policies, as the evidence shows systematic selective enforcement favoring management and HR personnel." Dkt. 18 at 4-5 ¶ 2. Plaintiff's attempted dispute is more appropriately considered argument and the evidence relied upon does not dispute the asserted fact regarding Defendant's expectations. Nonetheless, the Court has added information that can be gleaned from the cited exhibits related to the automated emails and suspension of PCards. Dkts. 18-3, 18-4. Accordingly, as so modified, there is no genuine dispute of material fact.

5. Plaintiff then submitted a written response as well as a separate response from a colleague explaining the information contained within the background check.

6. Defendant accepted Plaintiff's explanation, and Plaintiff was onboarded at Defendant in December 2022.

7. As part of his onboarding, Plaintiff was granted access to Defendant's Employee Handbook. He received both a physical copy and had access to a digital copy on Defendant's intranet site, known as SNAP.

8. Defendant periodically updates its Employee Handbook. At all times relevant to this case, Version 3.0 of the Handbook has been in effect. Defendant also occasionally published "explainers" with respect to Handbook policies.[4]

9. Defendant's Employee Handbook contains, among other things, anti-harassment and anti-retaliation policies.

10. The policy states that Defendant is "committed to providing a harassment-free workplace." The policy also "applies to all persons involved in the operation of the Organization and prohibits unlawful harassment by any employee of the Organization."

11. The Employee Handbook also includes reporting procedures if an employee believes that the anti-harassment or anti-discrimination policies have been violated.

12. The reporting policy identifies its goal as "resolv[ing] all such complaints in a timely manner."

13. The Employee Handbook makes clear that no employee "will be punished, discriminated against, or discharged, because they, in good faith, brought a complaint or assisted in the investigation of a complaint."[5]

---

[4] Plaintiff attempts to dispute the asserted fact in reliance on his deposition testimony. Dkt. 18 ¶ 8. But Plaintiff's deposition does not contradict the asserted fact that Version 3.0 of the Handbook was in effect during the relevant period. Rather, Plaintiff's deposition testimony reflects that Defendant also posted additional "explainers" of certain policies which added to the Handbook. Dkt. 18-1 at 111:16-112:10. The Court has modified the asserted fact to include this information. So modified, there is no genuine dispute of material fact.

[5] Plaintiff does not dispute the asserted fact; that is, Plaintiff does not dispute that the Employee Handbook contains the quoted language. Dkt. 18 ¶ 13. Accordingly, there is no genuine dispute of material fact.

In any event, Plaintiff argues that Defendant does not actually follow the policy "as evidenced by the systematic termination of employees who participate in the harassment investigations while protecting and supporting a complainant." *Id.* In the first instance, it is unclear how "supporting a complainant" would be inconsistent with the policy set forth in the Employee Handbook. Moreover, the evidence cited by Plaintiff does not support that there was

14. Defendant's Employee Handbook sets out specific work hours for its employees. Employees in Defendant's Arlington, VA office are generally expected to follow standard business hours of 8:30 a.m. EST to 5:30 p.m. EST, Monday through Friday.[6]

15. Some employees were classified as hourly employees, and were paid an hourly rate with the possibility for overtime.

16. In furtherance of these classifications, Defendant's employees tracked and entered their time on a daily basis.

17. Defendant provides certain employees with a travel expense and purchasing card (a "PCard").

18. As a Senior Administrative Assistant, Plaintiff was issued a PCard during his employment.

19. Defendant maintains policies governing PCard use on SNAP.

20. Defendant also publishes additional guidance relating to its PCard policies, in the form of a Guidelines document.

21. The policies explain acceptable and unacceptable uses of a PCard. Section 2 of the Policy states that PCards are "for business expenses only and may not be used for personal expenses."[7]

---

"systematic termination of employees who participate in the harassment investigations." Dkt. 18-6 (collecting of documents discussing complaint by Christian Trogdon-Lipscomb). In the parenthetical explaining the documents cited, Plaintiff states it shows "even though Greg Allum was 'done working with' Christian Trogdon-Lipscomb and 'doesn't have time to give her any coaching,' Christian Trogdon-Lipscomb was still provided substantial support by Defendant.'" *Id.* It is unclear what Plaintiff alleges is inappropriate with any of this and whether Allum was a participant in any harassment investigation or whether he was terminated. Accordingly, to the extent Plaintiff attempts to separately assert this as a fact, it is not supported by the cited record evidence.

[6] Plaintiff attempts to dispute what was generally expected by citing to his own deposition testimony and his interrogatory responses. Dkt. 18 ¶ 14. Plaintiff's deposition testimony and interrogatory responses do not dispute what was generally expected but merely supports that Plaintiff did not follow this procedure. *See* Dkt. 18-5 at 202:12-15 ("I didn't take PTO like everybody else did . . ."); Dkt. 18-1 at 14 ("I also performed overtime work for several months without logging it."). Indeed, Plaintiff's interrogatory responses undermine his argument here, because, when he logged less than 40 hours due to medical appointments, he was instructed to resubmit his time to reflect the 40-hour work week. Dkt. 18-1 at 14. Accordingly, there is no genuine dispute of material fact.

[7] Plaintiff does not dispute the asserted fact; that is, Plaintiff does not dispute that the Employee Handbook contains the quoted language. Dkt. 18 ¶ 21. Accordingly, there is no genuine dispute of material fact.

22. Section 5.5 of the Guidelines lists that "types of expenses" which are "generally considered personal." This includes, among other expenses, minibar charges and personal entertainment.

23. This policy requires employees to submit itemized receipts for all PCard purchases exceeding $75.

24. Employees are also required to submit expenses within 30 days, and an employee's PCard access is blocked if an expense is not submitted within 45 days.

25. As an employee, Plaintiff received training on Defendant's PCard policies and procedures.

26. Prior to his termination, Plaintiff was aware – including as of at least June 6, 2024 – that events involving alcohol required approval, having sought such approval on prior occasions in the "interest of remaining compliant" with Defendant's policies.[8]

      a. Policies related to expensing food and drink permit it for "business related purposes."

---------------

To the extent that Plaintiff asserts that "management and HR personnel routinely violated P-Card policies without discipline." Dkt. 18 ¶ 21. The asserted violations in the documents cited by Plaintiff do not appear related to the assertions regarding using the PCard for "business expenses only." Dkts. 18-3, 18-4. Moreover, without further explanation, the violations related to these two employees does not demonstrate that the policy was "routinely violated." Finally, to the extent Plaintiff relies on what appears to be a quiz on the policy, it reiterates that "[i]t is against company policy to charge a personal expense to your company card" and provides for a mechanism to address it "[i]f the company card is *accidentally* charged for a personal expense." Dkt. 18-7 at 2 (emphasis added). Accordingly, there is no genuine dispute of material fact.

[8] As an initial matter, in support of its asserted fact, Defendant mistakenly cited Exhibit 9, which appears to be a typographical error. From the context of the citation, it is clear that Defendant intended to cite Exhibit 10. *Compare* Dkt. 16 ¶ 26 (citing "**Exhibit 9**: Boyer Deposition Exhibit 24 – June 6, 2024 E-Mail Chain") *with* Dkt. 16-10 (Exhibit 10, which reflects Exhibit 24 from the Boyer Deposition and is a June 6, 2024 Email Chain).

Plaintiff "[d]ispute[s] any implication that happy hours required approval, as defendant's own P-Card training materials explicitly categorize '*any* food or drink that's purchased for business related purposes' as a 'business meal' that is reimbursable." Dkt. 18 ¶ 26 (emphasis in original). Although party cannot dispute an implication, *Crawford v. Newport News Indus. Corp.*, 2018 WL 4561671, at *5 n.5 (E.D. Va. Mar. 2, 2018) ("Facts are either admitted or not; to the extent they 'imply' any particular conclusion is argument, and the Court will treat such responses by Plaintiffs accordingly."), the Court will nonetheless modify the asserted fact to acknowledge that food and drink can be an appropriate expense when provided for a business related purpose. The evidence cited does not relate to whether happy hours required approval. Accordingly, as modified, there is no genuine dispute of material fact.

27. On June 18, 2024, Plaintiff attended a happy hour at First Down Sports Bar in Arlington, VA, near Defendant's corporate office.

28. The happy hour was organized by Christina Hunter. The happy hour was not approved by any supervisor at Defendant.[9]

29. Plaintiff and Hunter arrived at the happy hour during working hours, at sometime between 1:00 p.m. and 3:30 p.m. in the afternoon.

30. When Plaintiff and Hunter arrived, they opened a tab.

31. During the happy hour, Plaintiff ate chicken wings and drank 3 or 4 double shot vodka and tonics, representing a total of between six and eight shots of alcohol.

32. At approximately 4:30 in the afternoon, Plaintiff and Hunter were joined by Brianna James, Trogdon-Lipscomb, and Dorothy Sackey.

33. James opened a separate tab, which was closed at 5:52 p.m., and included drinks for herself, Hunter, Trogdon-Lipscomb, and Plaintiff, as well as food for herself, totaling $30.40.

34. At 6:35 p.m., the tab opened by Plaintiff and Hunter was closed. The tab totaled $144.64, and was split between two checks, equaling $72.32 per check, with no tip.

35. There was no "workshop" or "informational training component" to the June 18 happy hour.

36. Plaintiff reported on his timecard for June 18, 2024 that he arrived to work at 9:00 a.m. and worked until 5:00 p.m.[10]

37. Following the June 18 happy hour, Trogdon-Lipscomb raised concerns with her supervisor regarding then Vice President Greg Allum.[11]

---

[9] Although Plaintiff attempts to dispute the asserted fact regarding the implication that happy hours required approval, the cited evidence does not reflect on whether they required approval. Accordingly, there is no genuine dispute of material fact.

[10] Defendant failed to included the cited pages of the deposition transcript to support the asserted fact. Dkt. 16 at 6 ¶ 36 (citing Dkt. 16-1, Boyer Deposition Tr. at 177:20-178:3); Dkt. 16-1 (failing to include pages 177 or 178 of the deposition transcript). Nonetheless, the asserted fact is properly considered undisputed. *See* Dkt. 18 at 9 ¶ 36 ("**ADMIT.** Mr. Boyer reported working 9:00 AM to 5:00 PM on June 18, 2024.").

[11] Defendant asserts that Trogdon-Lipscomb's concerns were based on multiple layers of hearsay. In the first instance, that the declarant found about the concerns through instance does not mean the *concerns* were based on hearsay. Dkt. 16-15 ¶¶ 5-6. In the second instance, whether something is hearsay is a legal conclusion and not an assertion of fact. Accordingly, this assertion is omitted.

38. During the investigation into her concerns, investigators learned of the June 18 happy hour.

39. Additionally, as part of the investigation, Human Resource Leader Jillian Wilson spoke to James on multiple occasions.

40. During a June 25 interview with Wilson, James identified Plaintiff as another happy hour attendee. This was the first time that Plaintiff's name was mentioned as part of this investigation.

41. During those same interviews, James stated that she considered the June 18 happy hour to have occurred off the clock.

42. Following James' disclosure of Plaintiff's attendance, investigators obtained receipts from First Down Sports Bar for the June 18 happy hour.

43. Investigators also pulled the PCard records for Plaintiff, Hunter, and James.

44. Plaintiff's PCard records were pulled on June 27, before his first interview with HR.[12]

45. As part of the investigation, Plaintiff acknowledged that the June 18 happy hour was not an official happy hour. Plaintiff also claimed that Trogdon-Lipscomb did not attend the happy hour, which contradicted information from other individuals.[13]

46. The PCard investigation proceeded parallel to the investigation into Trogdon-Lipscomb's concerns.

47. The PCard investigation concluded that Plaintiff, Hunter, and James had each violated Defendant's policies and demonstrated poor stewardship and poor judgment.[14]

---

[12] Plaintiff admits the asserted fact, but attempts to dispute his view of the implication of the fact. Dkt. 18 ¶ 45. This is not appropriate. *See Crawford*, 2018 WL 4561671, at *5 n.5 ("Facts are either admitted or not; to the extent they 'imply' any particular conclusion is argument, and the Court will treat such responses by Plaintiffs accordingly."). Accordingly, there is no genuine dispute of asserted fact.

[13] Plaintiff admits the asserted fact, but disputes the implication of dishonesty. Dkt. 18 ¶ 45. This is not appropriate. *See Crawford*, 2018 WL 4561671, at *5 n.5 ("Facts are either admitted or not; to the extent they 'imply' any particular conclusion is argument, and the Court will treat such responses by Plaintiffs accordingly."). Accordingly, there is no genuine dispute of asserted fact.

[14] Plaintiff objects that the rationale of "poor stewardship" was not proffered a reason for Plaintiff's termination in Defendant's interrogatory response. Dkt. 18 ¶ 49. But the asserted fact is not premised on "poor stewardship" being a basis for Plaintiff's termination like the interrogatory. *Contrast* Dkt. 16 ¶ 49 (asserting conclusion of the investigation) *with* Dkt. 18-11 at 6 (asserting reasons for termination). In any event, the inclusion of poor stewardship is immaterial. Accordingly, there is no genuine dispute of material fact.

8

48. The Allum investigation did not substantiate any of the allegations against Allum.[15]

49. Trogdon-Lipscomb remained employed at Defendant following the conclusion of the investigation.

50. Following the PCard investigation, Defendant decided to terminate Plaintiff, Hunter, and James.[16]

51. Plaintiff, Hunter, and James were all terminated on July 19, 2024.[17]

   a. Another employee, A.S. was terminated in 2024, after being found sleeping with a bottle of alcohol, for excessive alcohol purchases on a PCard. Dkt. 16 at 9 n. 2.[18]

52. Plaintiff asserts that he loved his job and that he received positive performance reviews.

53. Plaintiff believed that the happy hour were within the policies on expenses.[19]

54. During Plaintiff's termination, he was told that he was being terminated for failing to uphold Defendant's principles of honesty.[20]

---

[15] Plaintiff disputes that the Allum allegations were false. Dkt. 18 ¶ 50. But the asserted fact does not suggest that the allegations were false, merely that they were unsubstantiated. Accordingly, there is no genuine dispute of material fact.

[16] Plaintiff asserts that the decision to terminate was made prior to a completion of the investigation, but Plaintiff cites to no record evidence. Accordingly, there is no genuine dispute of material fact.

[17] Plaintiff attempts to assert additional facts regarding the decision to terminate him that are not supported by the documents to which he cites. Dkt. 18 ¶ 65. Accordingly, those facts are not reflected here.

[18] This fact was asserted by Defendant in a footnote, but both parties rely on it in their analysis. Moreover, the fact is supported by citations to the record and Plaintiff does not dispute it. The Court adds Plaintiff's additional context to the asserted fact as well. Dkt. 18-12.

[19] Plaintiff attempts to assert that the happy hour was explicitly approved under Defendant's policy, but the documents to which he cites do not support this. Dkt. 18-2. Moreover, whether it was appropriate under the policy is immaterial, where the parties do not dispute that Plaintiff was terminated for a lack of honesty.

[20] Both parties rely on Plaintiff's deposition testimony to support the asserted fact and/or the dispute of fact. To the extent that Plaintiff attempts to rely on pages 211 or 212 of his deposition, those pages are not included in the excerpts provided by either party. *See* Dkts. 16-1, 18-5. Plaintiff's deposition testimony is otherwise supportive of the asserted fact. *See* Dkt. 16-1

55. During the termination meeting, Plaintiff did not claim that Defendant was discriminating or retaliating against him.

56. James understands Plaintiff's termination to be consistent with Defendant's policies.

57. Following Plaintiff's termination, Defendant continued to investigate PCard practices among its employees.

58. As part of this investigation, Defendant interviewed Stacy Connell, who was James' direct supervisor at the time of her termination.

59. Connell received coaching from her supervisor regarding PCard policies and best practices.

60. Connell was reminded that PCards are to be used "for expenses that are truly appropriate business expense[s]."

61. Following Plaintiff's termination, he sent an email to Vice President of Human Resources Alex Guerreiro criticizing the decision to terminate him. During that exchange, Guerreiro reaffirmed that Defendant terminated Plaintiff for "violat[ing] Stand Together principles and policies," including dishonesty and poor judgment.

62. An HR investigator, Katherine O'Neill, who recommended Plaintiff's termination had PCard violations herself for untimely submitted expense reports. Similarly, Plaintiff's manager, Ingrid Cunningham, had PCard blocks for failing to timely submit expense reports.

63. Brian Fay was subjected to a review of his PCard expenses for excessive alcohol purchases. Following a review, it was recommended that he receive coaching conversations, because "[m]ost things were not explicitly policy issues but more around economic spending."[21]

64. Trogdon-Lipscomb was not terminated and received coaching to address her performance issues.

65. Plaintiff did not have a problem with his PCard expenses until the Allum investigation.

---

at 210:9-14 ("She said, you know, 'Stand Together, our principles are honesty and integrity. You were asked a bunch of questions about the happy hour of June 18th. We don't feel that you answered those questions honestly, so we're terminating your employment effective immediately."); *id.* at 213:17-20 ("They said they didn't feel I answered them honestly and they were letting me go because Stand Together's principles were honesty, integrity, and they felt that I violated them."). Accordingly, there is no genuine dispute of material fact.

[21] Plaintiff asserted: "Brian Fay received a full investigation for excessive alcohol purchases and was not terminated, demonstrating selective enforcement." Dkt. 18 ¶ 68. This does not accurately summarize the cited document. Dkt. 18-16. Moreover, whether there was selective enforcement is argument. Accordingly, the Court has modified the asserted fact based on the information contained within the cited document. The Court does not include the next asserted fact in paragraph 69, because it is pure argument and not supported by the document cited.

10

## III. LEGAL STANDARD

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The party seeking summary judgment has the initial burden to show the absence of a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255. "(A) party opposing summary judgment may not simply rest on the allegations of his complaint, but must instead come forward with specific evidence showing the existence of a genuine issue of fact." *Muhammad v. Giant Food*, 108 F. App'x 757, 764 (4th Cir. 2004) (citing *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991)).

## IV. ANALYSIS

Plaintiff's Complaint asserts a single count of retaliation. Dkt. 1. In seeking summary judgment, Defendant argues that Plaintiff cannot establish a *prima facie* case of discrimination and that, even if he could, Defendant had a legitimate non-discriminatory reason for terminating him. The Court assumes without deciding that Plaintiff has satisfied his *prima facie* case;[22] nonetheless, because the Court finds that Defendant articulated a legitimate non-discriminatory reason ("LNR") for terminating Plaintiff and because Plaintiff has failed to demonstrate pretext, the Court will grant the MSJ.

---

[22] The parties do not analyze whether Plaintiff's participation in the investigation constitutes a protected activity. But as the Fourth Circuit has recognized, "[e]very Court of Appeals to have considered [t]he issue squarely has held that participation in an internal employer investigation not connected with a formal EEOC proceeding does not qualify as protected activity under the participation clause." *Stennis v. Bowie State Univ.*, 716 F. App'x 164, 167 (4th Cir. 2017) (quoting *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 49 (2d Cir. 2012)). Thus, the Court expresses some skepticism whether Plaintiff could satisfy his burden in this regard.

11

A Title VII retaliation case follows the same burden-shifting framework first set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show: (1) that he engaged in protected activity; (2) that the employer took a materially adverse employment action against the plaintiff; and (3) that a causal connection exists between the protected activity and the adverse employment action. *Perkins v. International Paper Co.*, 936 F.3d 196, 213 (4th Cir. 2019). If Plaintiff establishes his *prima facie* case, the burden shifts to Defendant to articulate an LNR and then Plaintiff must ultimately establish pretext or demonstrate that there are genuine issues of material fact suggestive of discrimination. The burden then shifts to Plaintiff to demonstrate that Defendant's justification is "unworthy of credence" or that there is other circumstantial evidence sufficiently probative of discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 147 (2000). As the Fourth Circuit has instructed, "the core of every Title VII case remains the same, necessitating resolution of the ultimate question of discrimination." *Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 255 (4th Cir. 2025) (internal citations and quotations omitted). Here, Plaintiff has ultimately failed to present any evidence suggesting that retaliation was the basis for his termination.

Defendant asserts that Plaintiff was terminated for his misuse of his PCard and failing to live up to principles related to honesty. Dkt. 16 at 16-17. This satisfies Defendant's burden to "articulate" a legitimate, nondiscriminatory reason, which is only a burden of production. *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007). The burden then shifts to Plaintiff to establish pretext.

Plaintiff argues that Defendant's LNR is pretextual because Defendant has given shifting reasons for his termination and because Defendant selectively enforced its policies. But no

12

reasonable juror could find that Defendant's proffered reason was pretextual. In the first instance, Plaintiff does not challenge that he was perceived as lacking honesty during and as a result of the investigation. Defendant has been consistent in referring to Plaintiff's dishonesty. As Plaintiff acknowledges, the notes in the termination spreadsheet indicate that Plaintiff was "[t]erminated due to a lack of honesty in the investigation process." Dkt. 18-12. At his termination meeting, Plaintiff was also told that he was being terminated for his lack of honesty. *See* Dkt. 16-1 at 210:9-14 ("She said, you know, 'Stand Together, our principles are honesty and integrity. You were asked a bunch of questions about the happy hour of June 18th. We don't feel that you answered those questions honestly, so we're terminating your employment effective immediately.'"); *id.* at 213:17-20 ("They said they didn't feel I answered them honestly and they were letting me go because Stand Together's principles were honesty, integrity, and they felt that I violated them."). Plaintiff's recollection is consistent with Defendant's script for the termination, which made clear that Defendant felt "you were not fully transparent with us" and that these "gaps in information you shared regarding that week and poor judgment" were resulting in his termination. Dkt. 18-15. It is unclear why Plaintiff considers references to a lack of transparency and gaps in the information provided to be meaningfully different from dishonesty. They are not and pretext is not established by minor changes in wording that mean the same thing. *See Cannada v. Old Dominion Brush Co., Inc.*, 2021 WL 5441506, at *8 (E.D. Va. Nov. 19, 2021) (holding that changes in "the wording and exact examples" does not establish pretext where "their reason for terminating [plaintiff] stayed consistent").[23] Thus, the decisions at the time Plaintiff was terminated were all remarkably consistent.

---

[23] *See also Conlay v. Baylor College of Medicine*, 688 F. Supp. 2d 586, 596 (S.D. Texas 2010) (granting summary judgment and finding no pretext where, "[t]o be sure, Traber and Stein do not use exactly the same words to describe their decision, and perhaps place different emphasis

Plaintiff further acknowledges and, indeed, argues that the "decision to terminate Mr. Boyer was made on July 18, 2024, prior to a full and complete investigation." Dkt. 18 at 12 ¶ 65. Thus, it is unsurprising that, after the investigation, Defendant referenced other, _additional_ bases for his termination. *See Phillips v. Mathews*, 547 F.3d 905, 913 (8th Cir. 2008) (holding that an additional reason for employee's discharge was not pretext because the employer did not change its justification but merely added to it); *Saud v. DePaul Univ.*, 154 F.4th 563, 569 (7th Cir. 2025) ("Where an employer relies on multiple reasons for the termination, its failure to address *all* of the reasons in *each* communication about the employee is not enough to show contradictions or shifts in rationales that suggest pretext."). But, even so, Defendant continued to consistently reference Plaintiff's dishonesty and violation of Defendant's honesty principles. *See* Dkt. 16-17 ("[T]hrough the course of the investigation, we discovered issues of pcard abuse, timesheet fraud, _dishonesty_, and poor judgment." (emphasis added)).[24] Likewise, Defendant's second interrogatory responses, after the full investigation and when asked to list "*every* legitimate, non-retaliatory, non-pretextual

---

on particular manifestations of her inadequate leadership, which is to be expected"); *Fountain v. Zimmer, Inc.*, 2021 WL 2125287, at *8 (N.D. Ind. May 25, 2021) ("The Court finds that any different in the exact language used between explanations for termination are not so inconsistent in the conveyed reasoning as to conclude that a reasonable juror could infer pretext.").

[24] Plaintiff's reference to Defendant's interrogatory responses is a non-sequitur. Plaintiff argues: "Eight months later, in its March 17, 2025 interrogatory response, Defendant claimed Boyer was terminated for [be]having in an 'evasive manner' in reimbursements and being 'dishonest and untruthful about his timesheets.'" Dkt. 18 at 17. But the interrogatory in question asked: "Identify and describe each and every fact you contend supports your denial, in paragraph 32 of your answer, of the allegations in Paragraph 32 of the complaint." Dkt. 18-18 at 7. Paragraph 32 of the Complaint asserts: "Mr. Boyer never committed timesheet fraud." Dkt. 1 ¶ 32. Of course the response to the interrogatory is going to reference timesheet fraud, when the interrogatory specifically asks Defendant to explain its denial of a paragraph asserting that Plaintiff did not commit timesheet fraud. Thus, properly framed in context, Defendant's interrogatory response does not offer a shifting explanation for Plaintiff's termination, because Defendant was not asked about reasons for his termination. Even so, Defendant's response is consistent with its reason for Plaintiff's termination because it refers to Plaintiff being "evasive," his "dishonest[y]," and his "untruthful[ness] about his timesheets." Dkt. 18-18 at 8.

14

reason for Plaintiff's termination," Defendant provided other, additional non-retaliatory reasons for his termination, but remained consistent that the termination was based on dishonesty. Dkt. 18-11 at 6-7 (emphasis added) (asserting that Plaintiff "violated Stand Together policies," "was not fully transparent with Stand Together," and "displayed poor judgment" and specifically referring to "Plaintiff's evasive behavior with respect to his request for reimbursements" and Defendant's conclusion that "Plaintiff *had been dishonest*" (emphasis added)).

In short, Defendant has consistently explained that Plaintiff was fired for dishonesty and, when asked to provide every potential basis for termination, has provided additional bases. But these minor changes in verbiage or the citation to additional bases for termination are not sufficient to establish pretext. *See Anderson v. Discovery Communc'ns, LLC*, 517 F. App'x 190, 196 (4th Cir. 2013) (holding that "different individuals characterize[ing] her conduct using slightly different examples or terminology" is not sufficient to establish pretext where the "explanation for its decision has been consistent"); *Hux v. City of Newport News, Va.*, 451 F.3d 311, 315 (4th Cir. 2006) (holding that a plaintiff "cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do no cast doubt on the explanation's validity"). Thus, no reasonable juror could find in Plaintiff's favor in this regard.

Plaintiff attempts to attack each of the bases for his termination. To begin with, Plaintiff argues that the prohibition on use of the PCard for personal expenses was "routine." Dkt. 18 at 18. But the evidence upon which Plaintiff relies is what appears to be a quiz, provided without context, which emphasizes that "[i]t is against company policy to charge a personal expense to your company card," and provides a code *if* "the company card is *accidentally* used for a personal expense." Dkt. 18-7 (emphasis added). Thus, the document contains no reference to frequency and emphasizes that such use of the PCard is a violation of company policy.

15

Plaintiff next argues that PCard "blocks" based on untimely submissions of expense reports were company among Defendant's employees. Dkt. 18 at 18. But Plaintiff does not point to anywhere in the record where Defendant asserted that it terminated Plaintiff for failing to timely submit a PCard expense report. Thus, this argument has no relevance with respect to whether Plaintiff was treated differently from similarly situated persons. Likewise, Plaintiff's argument that he was not previously reprimanded for splitting charges does little to advance Defendant learning of that practice now is pretextual. Plaintiff provides a receipt indicating that, on one other occasion he split a bill so that the checks fell below the $75 reporting threshold. Dkt. 18-19. But Plaintiff provides no evidence that anyone at Defendant approved of this practice, noticed this practice, or even that it was a practice used on more than two occasions. Indeed, courts have rejected the premise that, "by not addressing [an] issue earlier, [a defendant] somehow forefeited its right to count these problems as black marks on his record." *Graham v. Arctic Zone Iceplex, LLC Keyser v. Terracon Consultants, Inc.*, 2024 WL 4817266, at *7 (D. Colo. Nov. 18, 2024) (holding that a failure to question an employee about a potential policy violation is insufficient to create a genuine issue of material fact as to pretext).

Plaintiff further argues that a reasonable jury could find Defendant's allegations of timecard fraud as unsupported. Not so. Plaintiff testified that he arrived at the June 18, 2024 happy hour at around 3 or 3:30 in the afternoon, yet he reported that he was "working 9:00 AM to 5:00 PM." Dkt. 18 at 8-9 ¶¶ 29, 36. Thus, Plaintiff has conceded that he reported that he was working when he was attending the happy hour and Plaintiff offers no explanation for why this inaccuracy would not constitute fraud. Plaintiff further concedes that he often failed to accurately report his time. Dkt. 18 at 19. Although Plaintiff contends that he often underreported his time,

16

Plaintiff does not explain why this would excuse his failure to honestly and accurately report his time.

Finally, Plaintiff also attempts to establish pretext by asserting that Defendant selectively enforced its policies. Plaintiff's selective enforcement argument does not address the heart of Defendant's LNR – that he was dishonest, but the Court will nonetheless address it to the extent it goes to the other, additional reasons for termination identified by Defendant. The selective enforcement argument is limited to an argument regarding whether Plaintiff's use of the PCard for personal charges is a terminable offense. The parties each point to a potential comparator: (i) Plaintiff points to the counseling of Connell; and (ii) Defendant points to the termination of A.S. In the first instance, Connell is not an appropriate comparator. *See Johnson v. Baltimore City, Md.*, 163 F.4th 808, 818 (4th Cir. 2026) (emphasizing that a comparator must be similar in all relevant respects and holding that "*relevant* facts for a comparator analysis" are that the individual engaged in similar conduct, held the same position, and was subject to the same set of standards). Connell was a supervisor, unlike Plaintiff, and Connell received a warning not for her own PCard abuses, but for approving the charges of others. Dkt. 16 at 20 (conceding that "Connell received an eight-month series of 'coaching warnings' despite repeatedly approving . . . violations of P-Card policy by her subordinates"). Moreover, none of the expenses that Connell approved appear to have been related to alcohol and Plaintiff does not assert that they were. Even so, in the disciplinary write-up, Connell was warned that her employment could end. Dkt. 18-17. A.S. provides a more appropriate comparator. Plaintiff argues that A.S.'s conduct is materially different from his own, because A.S. was found "asleep in the office with an empty bottle of Jack Daniels" and had excessive alcohol purchases. Dkt. 18 at 20. Not so. Both Plaintiff and A.S. were drinking during office hours with alcohol purchased on the company credit card and both were terminated.

17

Plaintiff also notes that "A.S. is not a valid comparator" because, "unlike Mr. Boyer, A.S. did not engage in protected activity." *Id.* But that is the point, a similarly situated comparator is supposed to be similarly situated in all material respects *except* for a protected characteristic. *See Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 721 (4th Cir. 2013) (recognizing that comparator evidence relates to evidence that "employees who were similarly situated to the plaintiff (but for the protected characteristic) were treated more favorably").

In short, a reasonable juror could not find in Plaintiff's favor on any of the identified bases of pretext. Moreover, there is no other evidence in the record that would support a reasonable inference of retaliation on which Plaintiff carries the ultimate burden. *Wannamaker-Amos*, 126 F.4th at 255. Here, the two main objects of the Title VII investigation (Trogdon-Lipscomb – the complainant – and Allum – the subject of the complaint) received no discipline. Plaintiff gives no indication of what he said or did during the course of the investigation, other than his policy violations and dishonesty, that would give rise to a retaliatory animus. Indeed, Plaintiff appears irritated that Trogdon-Lipscomb *did not* receive discipline for her complaints, which is the essence of Title VII's retaliation provision. *Contrast* 42 U.S.C. § 2000e-3 (making it unlawful for an employer to act against an employee because "he has opposed any practice made an unlawful employment practice") *with* Dkt. 18 at 6 ¶ 13 (alleging "the systematic termination of employees who participated in the harassment investigation while supporting and protecting a complainant"). The lack of retaliatory animus is particularly stark where, again, Plaintiff did not participate in an activity protected by Title VII. *Stennis*, 716 F. App'x at 167 ("Every Court of Appeals to have considered [t]he issue squarely has held that participation in an internal employer investigation not

18

connected with a formal EEOC proceeding does not qualify as protected activity under the participation clause.").[25]  Accordingly, the MSJ will be granted.

## IV.  CONCLUSION

In short, Plaintiff has failed to demonstrate any genuine issue of material fact, and Defendant is entitled to judgment on the sole count of the Complaint..

Accordingly, it is hereby ORDERED that the MSJ (Dkt. 15) is GRANTED; and it is

FURTHER ORDERED that the Clerk of the Court is DIRECTED to enter Rule 58 judgment in favor of Defendant and against Plaintiff on the Complaint and to place this matter among the ended causes.

It is SO ORDERED.

Alexandria, Virginia
May 4, 2026

/s/
_____
Rossie D. Alston, Jr.
United States District Judge

---

[25] *See also Johnson v. Portfolio Recovery Assocs., LLC*, 682 F. Supp. 2d 560, 583 (E.D. Va. 2009) ("Plaintiff's participation in any asserted internal investigation by Defendant prior to termination is not protected activity under the participation clause because any such asserted internal investigation must have occurred prior to, and therefore unrelated to, the filing of any EEOC charge.")

19